Carlton V. HOWARD, Sr., Trustee under a Declaration of Trust of Which Carlton V. Howard, Sr. is Trustor, Appellant,

v.

SCHILDBERG CONSTRUCTION COMPANY, INC., An Iowa Corporation, Appellee.

No. 93–1638.

Supreme Court of Iowa.

March 29, 1995.

shall enter into agreements with each other as to the division of costs thereof.

Roger T. Stetson and Robert D. Sharp of Belin Harris Lamson McCormick, P.C., Des Moines, for appellant.

R. Jeffrey Lewis and S.P. DeVolder of Gamble & Davis, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

Plaintiff brought this declaratory judgment action seeking relief from the burdens of a mining lease with the defendant. Plaintiff claimed that (1) the lease was unenforceable because it violated the agricultural land alienation restriction of the Iowa Constitution and (2) it could not be renewed for a third term because the lease did not provide for perpetual renewals. In the alternative the plaintiff claimed that the lease did not encumber the plaintiff's property north of the East Nodaway River. The district court rejected the plaintiff's arguments that the lease was unenforceable and nonrenewable and ruled that the lease encumbered all of the plaintiff's property.

Plaintiff appealed. Because we agree with the rulings of the trial court, we affirm.

I. *Background Facts and Proceedings.*

In 1960, Carlton V. Howard Sr., Walter Howard and Margaret Howard entered into a "limestone and gravel lease" with the Mis-

souri Valley Limestone Company. The agreement described the leased premises to include the family farm which was located north and south of the East Nodaway River. It allowed Missouri Valley to use the land only for the purpose of mining limestone and gravel. The Howards rented that part of the land not being mined to others for the production of crops and livestock.

The mining lease provided for the payment of royalties or rent for an initial term of twenty years. It also contained the following renewal provision:

> 3. *Renewal.* If not in default hereunder at the expiration of this Lease or a renewal thereof, Lessee may renew the same for additional terms of 10 years, upon the same terms and conditions as provided in this Lease, so long as the limestone or gravel deposit is not exhausted, by giving Lessor written notice of Lessee's election so to do at least sixty (60) days before such expiration.

The lessee had complete discretion under the lease to determine the conduct of its mining operations. However, an addendum to the lease required that the lessee obtain the lessor's written permission to conduct operations on the property north of the river.

In 1963, Missouri Valley conveyed its interest in the lease to the defendant-appellee, Schildberg Construction Company. At the end of the original twenty-year term in 1980, Schildberg renewed the lease for an additional ten years. In 1982, the farm was transferred to a trust of which Carlton Howard (hereinafter "Howard") was the trustor and trustee.[1]

In 1990 Schildberg sought another ten-year extension of the lease. The trust objected to the second renewal and Howard filed this action in 1991. Howard sought to have the lease declared invalid and unenforceable. Alternatively, he asked the court to interpret the lease as not encumbering that portion of the farm north of the river.

Both parties filed motions for summary judgment. In its rulings on the motions and two subsequent motions filed pursuant to Iowa Rule of Civil Procedure 179(b), the district court held that the lease was valid and enforceable. The court concluded that the lease did not fall within the agricultural land alienation provision of the Iowa Constitution. It also concluded that the lease allowed multiple renewals. Finally the court ruled that a factual dispute existed with respect to whether the lease encompassed the property north of the river.

This remaining factual issue was tried to the court. The trial court found that the lease unambiguously encumbered the property north of the river. The court entered judgment for Schildberg. Howard appealed.

## II. *Scope of Review.*

The parties dispute the scope of review. Howard claims the case was tried in equity and therefore, review is de novo. Schildberg contends that although the petition was filed in equity, the factual issue was tried at law.

■ We first note that even in an equity case, we do not find facts de novo in an appeal from a ruling on summary judgment. *Farm & City Ins. Co. v. Anderson,* 509 N.W.2d 487, 489 (Iowa 1993). Accordingly, our review of the court's ruling on the motions for summary judgment is on error. *Id.*

■ Our review of the court's decision after trial is governed by how the case was tried in the district court. *Grinnell Mut. Reinsurance Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988). The court's judgment characterized this action as one in equity. However, the trial judge ruled on objections, "normally the hallmark of a law trial." *See Sille v. Shaffer,* 297 N.W.2d 379, 381 (Iowa 1980).

■ Although we disapprove of the practice of making evidentiary rulings in equity cases, the fact that the trial judge did so does not automatically transform an equity case to one at law. *See id.* Where, as here, no one claims that the trial court improperly excluded evidence, the trial court's ruling on objections does not prevent a de novo review.

---

1. The lease provided that it would "bind and inure to the benefit" of any "administrators, executors, successors, transferees, and assigns" of the parties.

*Id.* Therefore, we will review the court's judgment after trial de novo.

### III. *The Constitutional Restriction on Agricultural Land Alienation.*

■ The Iowa Constitution provides:

No lease or grant of agricultural lands, reserving any rent, or service of any kind, shall be valid for a longer period than twenty years.

Iowa Const. art. I, § 24. We must decide whether the lease between the trust and Schildberg is a "lease ... of agricultural lands." A similar, but not identical, issue was involved in *Trustees of Green Bay Levee & Drainage District v. Alexander*, 252 Iowa 801, 108 N.W.2d 593 (1961).

In the *Alexander* case, a power company entered into a settlement contract with landowners who had objected to the establishment of a drainage district. *Alexander*, 252 Iowa at 805, 108 N.W.2d at 595. The company promised the property owners that they would be assessed only five cents per acre annually in return for the landowners' agreement to the inclusion of their land in the drainage district. *Id.* The property owners later sought to have the contract declared invalid under the agricultural alienation provision. *Id.* at 812, 108 N.W.2d at 600. We held that article I, section 24 did not prohibit this contract because it was not a "lease or grant." *Id.* We said, "A lease or grant of agricultural land is a contract for the possession and profits of land." *Id.*

The present case takes the *Alexander* analysis one step further. The issue here is whether an agreement for the possession and profits of land *for solely non-agricultural purposes* is a "lease or grant of agricultural lands," as those words are used in article I, section 24. We did not answer that question in *Alexander.*

■ In deciding the meaning of this constitutional provision, we strive to ascertain the intent of the framers. *Redmond v. Ray*, 268 N.W.2d 849, 853 (Iowa 1978). We give the words used by the framers their natural and commonly-understood meaning. *Id.* However, we also examine the constitutional history and consider "the object to be at-tained or the evil to be remedied as disclosed by circumstances at the time of adoption." *Id.* Thus, we begin with a review of the purpose of article I, section 24.

Our constitutional limitation on the term of agricultural leases originated in the New York Constitution of 1846. *Casey v. Lupkes*, 286 N.W.2d 204, 206 (Iowa 1979). Such restrictions were intended to prevent oppressive, long-term leases of manorial land to tenants who had no incentive to improve the land. *Id.* at 205. As the New York Court of Appeals stated in 1900:

The evil aimed at by the constitution is long leases of farming lands for farming purposes, not the ... erection of dwelling houses, stores, or manufactories, or of a mine in the bowels of the earth, with the right to bring ore to the surface and ship it.

*Massachusetts Nat'l Bank v. Shinn*, 163 N.Y. 360, 57 N.E. 611, 613 (1900).

Consistent with this purpose, the New York court concluded in *Shinn* that a mining lease did "not come within the spirit of the constitutional prohibition." *Id.* The court observed that the lease "was not a lease of agricultural lands for agricultural purposes, but of mineral lands for mining purposes." *Id.* The court reached this conclusion even though the land encumbered by the lease was suitable for farming and was used for agricultural purposes to the extent the land was not required for mining purposes. *Id.*

Other states with similar constitutional provisions have also held that a lease of agricultural land for non-agricultural purposes only does not fall within the constitutional restriction. *De Grasse v. Verona Mining Co.*, 185 Mich. 514, 152 N.W. 242, 250 (1915) (fifty-year lease of agricultural land for purpose of mining ore was valid because it expressly prohibited any agricultural use); *Bookout v. White*, 123 Mont. 459, 214 P.2d 861, 863 (1950) (upholding ninety-nine year lease of half an acre of land with a cabin for hunting and recreational use); *Berry–Iverson Co. of N. Dakota, Inc. v. Johnson*, 242 N.W.2d 126, 132 (N.D.1976) (lease of longer than permissible duration upheld because it was for use of land as a radio transmitter

tower site); *Ryan v. Sioux Gun Club*, 68 S.D. 345, 2 N.W.2d 681, 683 (1942) (interpreted a similar constitutional provision to permit leases that excluded agricultural use of the land).

We join with these courts and hold that our constitutional agricultural land alienation restriction does not apply to agricultural land leased for purely non-agricultural purposes. Because the lease between the trust and Schildberg is clearly limited to use of the land for mining of limestone and gravel,[2] this mineral lease does not fall within the constitutional restriction.

### IV. *Scope of Lease as Encumbering Property North of the River.*

After trial, the district court found and concluded that the lease applied to the property owned by the trust north of the river. The trust claims that the trial court is wrong.

The dispute over the scope of the lease arises from the interplay of the main body of the lease and an addendum to the lease. Both parties agree that paragraph one of the lease describes the property subject to the lease to include the land north and south of the East Nodaway River. However, an addendum to the lease provides in pertinent part:

That this agreement and addendum, being executed concurrently with the Execution of the Limestone and Gravel Lease to which this addendum is attached, by and is hereby incorporated in and made a part of said Limestone and Gravel Lease. That the intent and purpose of this addendum is to modify and supplement said lease hereinbefore mentioned by the following provisions:

I. Paragraph 4(a) of the Limestone and Gravel Lease shall be modified to provide the conduct of operations mentioned in said paragraph shall be limited to that portion of the lease of the described prem-

ises which lies South of the East Nodaway River as now established, except in the event that lessor gives and grants permission in writing to conduct operations on the remaining portion or portions of the lease as described.

Paragraph 4 of the lease to which the addendum refers is entitled "Operations, Rent and Royalty." Subparagraph 4(a) gives the lessee, now Schildberg, complete discretion to decide when, where, and how much will be mined.

Our goal in interpreting this lease is to ascertain the meaning and intention of the parties. *Power Eng'g & Mfg., Ltd. v. Krug Int'l*, 501 N.W.2d 490, 493 (Iowa 1993). Unless the contract is ambiguous, we determine the parties' intent from the language of the contract. *Id.* Consequently, where the intent of the parties is expressed in clear and unambiguous language, we enforce the contract as written. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991).

We think the contract as written is unambiguous. The lease encumbers the property north and south of the river as clearly stated in paragraph one in the main body of the lease. The addendum does not modify this portion of the lease. The addendum straightforwardly states that it modifies paragraph 4(a) of the lease. Paragraph 4(a) gives Schildberg total discretion with respect to its mining operations. The addendum merely restricts this discretion as it applies to the property north of the river. With respect to that property, the addendum requires Schildberg to obtain the property owner's permission to commence operations. Had the parties wanted to remove the property north of the river from the lease entirely, they could easily have done so by modifying paragraph one of the lease.

We conclude that the property north of the East Nodaway River is subject to the lease. Because we have not relied on the expert

---

**2.** Howard does not claim that use of the farm for mining limestone and gravel is an agricultural purpose. Iowa statutes have consistently defined agricultural land as "land suitable for use in farming." Iowa Code § 9H.1(2) (1993). *See also id.* §§ 161A.42(1), 175.2(2), 558.43(4),

567.1(1), 654A.1(1). Farming is consistently defined as "the cultivation of land for the production of agricultural crops, ... grazing or the production of livestock...." *Id.* § 9H.1(11). *See also id* §§ 175.2(10), 567.1(2). Therefore, mining is not an agricultural purpose.

testimony introduced by Schildberg, we need not consider Howard's challenge to the admission of this testimony.

### V. *Multiple Renewals of the Lease.*

■ Howard claims that the lease does not expressly provide for *perpetual* renewals and therefore, Schildberg is entitled to only one renewal. We have stated that "[a]s a general rule, a general covenant to renew is satisfied by one renewal, unless further renewals are expressly provided for." *Potter v. Henry Field Seed Co.*, 239 Iowa 920, 928–29, 32 N.W.2d 385, 390 (1948). However in a case involving a contract as opposed to a renewal provision of a lease, we held that where the intent of the parties to create a perpetual contract is clear, the contract is enforceable. *City of Des Moines v. City of West Des Moines*, 239 Iowa 1, 13, 30 N.W.2d 500, 507 (1948). In concluding that the perpetual contract at issue in *City of Des Moines* was valid, we analogized to perpetual leases noting that while such leases are not favored, they too are enforceable. *Id.* at 12, 30 N.W.2d at 506.

■ Because perpetual leases are not favored, the intent to create one "must appear in clear and unequivocal language." 50 Am. Jur.2d *Landlord & Tenant* § 1171, at 56 (1970). Courts that have enforced perpetual renewals of a lease have done so only where the perpetual nature of the lease is unmistakable. *E.g., Blackmore v. Boardman*, 28 Mo. 420, 420 (1859) (lease was renewable for another term of ten years "and so on from time to time perpetually at the option of the [lessee]"); *Dixon v. Rivers*, 37 N.C.App. 168, 245 S.E.2d 572, 574 (1978) (perpetual lease created where renewal provision stated that lease "shall be renewable every 10 years for so long as [the lessees] desire"); *cf. City of Des Moines*, 239 Iowa at 13, 30 N.W.2d at 506 (enforcing perpetual contract where agreement referred to defendant's "perpetual use" of the plaintiff's sewer facilities).

The requirement that the parties' intent be unmistakable protects "property owners from inadvertently leasing away their property forever." *Lattimore v. Fisher's Food Shoppe, Inc.*, 313 N.C. 467, 329 S.E.2d 346, 348–49 (1985); *see Farris v. Laurel Explosives, Inc.*, 797 S.W.2d 487, 490 (Ky.Ct.App. 1990) (lease not perpetual in absence of language that would "place an ordinary person on notice"). Thus, unless a lease uses language such as "perpetual," "in perpetuity" or "forever,"[3] courts usually construe the lease as providing for only one renewal. *E.g., Womack v. Hyche*, 503 So.2d 832, 836 (Ala. 1987); *Pults v. City of Springdale*, 23 Ark. App. 182, 745 S.W.2d 144, 147 (1988); *Lonergan v. Connecticut Food Store, Inc.*, 168 Conn. 122, 357 A.2d 910, 914 (1975); *Krug v. Deering Implement Co.*, 239 Iowa 157, 164, 30 N.W.2d 729, 732 (1948) (dicta); *Kilbourne v. Forester*, 464 S.W.2d 770, 773 (Mo.Ct.App. 1970); *McCreight v. Girado*, 205 Or. 223, 287 P.2d 414, 419 (1955); *cf. Farris*, 797 S.W.2d at 490 (holding lease void rather than limiting to one renewal); *Carolina Cable Network v. Alert Cable TV, Inc.*, 447 S.E.2d 199, 203 (S.C.1994) (holding contract to be terminable at will). *But see Mackie v. Leonard Refineries, Inc.*, 372 Mich. 104, 125 N.W.2d 482, 484–85 (1963) (finding perpetual lease created by language that the automatic renewal provision of lease "shall also be operative upon each and every renewal lease"); *President & Trustees of Ohio Univ. v. Athens Livestock Sales*, 115 Ohio App. 21, 18 O.O.2d 78, 179 N.E.2d 382, 383 (1961) (finding perpetual lease based on language giving tenant right to occupy property "on a year to year basis until terminated by the lessee").

On the other hand, courts have refused to apply the one-renewal rule where two circumstances exist: (1) the lease clearly provides for multiple renewals and (2) the lease contains a condition, the occurrence of which terminates the right to further renewals. *See, e.g., Cain v. Goldking Properties Co.*, 408 So.2d 1364, 1366 (La.Ct.App.1981) (refus-

---

**3.** Courts have disagreed on whether use of the term "successive" unmistakably indicates a lease of unlimited and unending duration. *Compare Geyer v. Lietzan*, 230 Ind. 404, 103 N.E.2d 199, 201 (1952) (lease providing for "successive renewals" did not create perpetual lease) *and Latti-* more, 329 S.E.2d at 350 (the word "successive" does not have the same import as the customary words of perpetuity) *with Pechenik v. Baltimore & Ohio R.R.*, 157 W.Va. 895, 205 S.E.2d 813, 815 (1974) (lease providing for "successive renewals" created a perpetual lease).

ing to limit renewals of a surface lease where lease would terminate when lessee "no longer needs the surface location" for its oil drilling operations); *DeSantis v. Kessler*, 83 A.D.2d 766, 443 N.Y.S.2d 485, 486–87 (1981) (one-renewal limitation not applicable because lease provided that ability to renew would terminate upon landlord's sale of the property). Courts have concluded that a lease which will terminate on a specified event, even when that event is indefinite, is not perpetual. *Haeffner v. Green Fire Brick Co.*, 76 S.W.2d 122, 126 (Mo.1934) (where renewal of lease was limited by clause "so long as paying minerals are found," renewals were not perpetual); *Lewis v. State*, 207 Mont. 361, 675 P.2d 107, 114 (1984) (lease allowing multiple renewals "so long as an active mining operation is being carried on" was not a perpetual lease); *Hamblen County v. City of Morristown*, 584 S.W.2d 673, 677 (Tenn.Ct. App.) (enforcing lease that would run "so long as the [newly constructed high school] is used for educational purposes"), *cert. denied*, 584 S.W.2d 673 (1979); *see Department of Natural Resources v. Board of Trustees of Westminister Church*, 114 Mich.App. 99, 318 N.W.2d 830, 833 (1982) (enforcing lease providing for multiple renewals "so long as the property is used as a camp for boys and girls" on rationale that the lease created "a valid perpetual renewal clause"). The underlying rationale of these cases is apparently that the one-renewal limitation is not necessary where the lease itself limits the number of renewals.

We need not decide whether the language of the lease involved here evidenced an intent to create a perpetual lease. Even if the trust is correct that it did not, we think the one-renewal rule does not apply because Schildberg's right to additional renewals will end upon the occurrence of a condition specified in the lease. Our reasons for this conclusion follow.

In deciding whether Schildberg is entitled to renew the lease more than once, our first task is to examine the lease to decide whether it allows multiple renewals. We think it clearly does. The renewal provision of the lease allows the lessee to renew the lease "for additional *terms*" "at the expiration of this Lease *or a renewal thereof.*" (Emphasis added.) The ability to renew at the end of a renewal term for additional terms shows that the parties contemplated multiple renewals. *Becker v. Submarine Oil Co.*, 55 Cal.App. 698, 204 P. 245, 246 (1921). In addition, the lease allows Schildberg to terminate the lease "or *any* renewal thereof," again suggesting multiple renewals. (Emphasis added.)

Having concluded that the lease allows multiple renewals, we must consider whether the contract itself provides for termination of the renewal provision upon the occurrence of an ascertainable event. The lease says that the lessee may renew "so long as the limestone or gravel deposit is not exhausted." Thus, renewals are not perpetual because the right to renew automatically terminates when the limestone and gravel are exhausted.

Nevertheless, Howard argues that the exhaustion condition is entirely dependent upon the will of the trustees. He claims this condition will never be satisfied because "absent permission of the [trustees], which will not be forthcoming under the same terms as existed in the October 1960 lease, Schildberg cannot quarry rock north of the river." Howard concludes, therefore, that the minerals will never be exhausted and therefore, the lease is perpetual.

The trust's stated intention not to allow mining north of the river unless Schildberg agrees to new terms and conditions brings to the surface the real reason for this lawsuit. Carlton Howard's son, also one of the co-trustees of the trust, testified that the trust does not object to mining operations on the land north of the river.[4] Its objection is to mining operations at a royalty rate of ten cents per ton.

We reject the trust's efforts to extricate itself from the bargain it struck. The trust's voluntary refusal to allow mining north of the river does not transform an enforceable lease

---

**4.** The record shows that members of the Howard family who owned the property in the 1930s and 1940s permitted quarrying activity north of the river during that time.

into one that can be terminated at the will of the lessor. Where the intent of the parties is clear, we will not, under the guise of interpreting the lease, relieve one party of a bad bargain.[5]

The intent here is clear. The lessee had the right under the lease to conduct mining operations until the limestone and gravel were gone, provided it was not in default under other terms of the lease. The lessee had discretion as to whether, when, where and how to conduct its operations with one exception. That exception was the discretion given to the lessor to decide whether mining would be conducted north of the river. We leave the parties with the bargain they made.[6]

### VI. *Summary.*

The lease agreement between the trust and Schildberg does not violate the agricultural land alienation restriction of the Iowa Constitution. It encumbers the trust's property both north and south of the river. Schildberg may continue to renew the lease so long as the limestone and gravel are not exhausted and so long as Schildberg is not in default. The district court was correct in its rulings.

**AFFIRMED.**

---

**5.** Howard makes no claim that the lease is unconscionable. *See Gentile v. Allied Energy Prods., Inc.,* 479 N.W.2d 607, 609 (Iowa Ct.App.1991).

**6.** At the time of this action, Schildberg had not requested permission to mine north of the river. We express no opinion on whether any future refusal by the trust to permit mining operations on the land north of the river is a breach of the contract. *See Midwest Management Corp. v. Stephens,* 291 N.W.2d 896, 913 (Iowa 1980) (discretion given to one party to a contract had to be exercised "in a reasonable manner on the basis of fair dealing and good faith").